on behalf of the Apple, I'm Mr. Philip Piscopo. On behalf of the Apple, I'm Mr. David A. Miller. Thank you. Mr. Piscopo, you may proceed. Good morning, Your Honor. I am Philip Piscopo and I represent the plaintiff in this case. Mr. Walsh, I will be present in court to watch these proceedings. This case is about a person, our client, John Collins, who was employed by a ski lift operator at Villa Olivia and he observed a significant defect in the ski lift. As a result of the defect, he imposed a safety procedure with which the defendant concurred until the defect could be repaired. And that safety procedure consisted of loading the lift with every other chair and only two people per lift instead of four. Did your client actually operate the lift or was he just a manager to make sure that it was being operated properly? If you're asking was he the person who actually flipped the switch and ran the thing or put the people on the lift, that answer is no. However, he did have authority and part of his job duty was to make sure that it was operating correctly. And so your manager's suggestion is fairly accurate. I don't mean to short circuit you, but this question is on the top of my mind. So when he came back after a day off or whatever it was and found that it was being operated with full four people in every lift and he told someone you shouldn't be doing it that way, did it change? Yes, it did change. Again, I mean that second time. Right, because he instructed the operator who I understand was reluctant to actually operate it that way in the first place. He told him, no, that's wrong. That's unsafe. And so you need to operate it the way we have been because the defect isn't fixed yet. And if you don't, then there's a risk that this heel is going to crash. And then what happened? After that, he was called into the office of the supervisor. Her name is Rita Fletcher. I don't recall her position at the time, but she was one of the higher-ups at Villa Olivia. And she told him that, now, I made this call and I'm going to operate it that way. And Mr. Collins said, well, you can't because it's wrong. It's unsafe and it violates the code. He's been doing this for a long time, and so he's familiar with the codes and he's familiar with the way ski lifts generally and this ski lift in particular operate. So he told her, I can't cooperate on that because that would be wrong and it risks a crash. Did he offer to resign on that day? He did not offer to resign on that day. But she persisted in her opinion, and then later, not long thereafter, he was fired for that. And that, we submit, gives rise to the two claims that we raise in our complaint, which is the Whistleblower Act and the Tort of Retaliatory Discharge. I thought when he showed up for work and saw the lifts being loaded with full capacity that he told the operator, you shouldn't be doing this. The operator said, I was told to do it by either Fletcher or Carlson or one of these other people. Is that correct? Yes. That's what we alleged in our complaint. And then that person just continued to do that and then your client went to go speak to Fletcher. No, he didn't. Well, he didn't continue to do that. In the conversation between Mr. Collins and the person flipping the buttons and loading the people, Mr. Collins told him, no, you need to operate it with the way that we have been doing it, which is the two people every other chair. And the operator complied with that instruction. But he did actually start to do that again until, of course, Mr. and Mrs. Fletcher said, no, do it my way. Okay. Did Mrs. Fletcher look at your client and say, go out there and tell that operator to load that to full capacity? I don't believe that she did that. I didn't allege in the complaint. She may well have done that. But what's more likely to happen is that she took him and kept him away from the lift altogether after that because she recognized that he wanted to do it the right way and she didn't. And so he wasn't going to let her do anything on it anymore. What was he offered to do or what was demanded of him that he then refused to do? What was demanded of him? Well, in his capacity as a person who was supervising the lift and making sure it's operating correctly, they wanted him to not object or not do anything about their decision to ride it at full capacity. In other words, even though his responsibility included making sure that the lift complies with the ANSI standards and the CARSA code, she said, no, you can't do that. You have to do something else. You have to operate at full capacity anyway. And I don't care if you think it's wrong. You're going to do it that way anyway. But he was offered to not object, and then he persisted to object. Well, I don't know if he was offered to not object. One thing he couldn't do was go tell the operator to operate it at the half capacity like he did previously. That was one of the things that he was not allowed to do based on Fletcher's order. And he said, well, I can't do that. Well, I'm getting to the Sardiga case, and I'm just trying to figure out what was he – and Sardiga looked at Black's Law Dictionary and talked about refusal means the denial or rejection of something offered or demanded. What was offered of him or demanded of him that he said, I'm not doing that? And again, if Fletcher had looked at him and said, you go out there and you tell that operator to go load that at full capacity, and he said, I am not doing that, then maybe we're talking about something. But if he's just simply taken out of the loop, then we're in the common law retaliatory discharge and out of this whistleblower, at least under Sardiga if we chose to agree with that case. Well, in the Sardiga case, what it said, that was just a guy, and he had nothing to do with what Northern Trust was up to, these illegal or unethical activities that weren't really specified in Sardiga anyway. He had nothing to do with those at all. And so he complained about it because I think what that other guy is doing is wrong, and then the bank finally got tired of that and fired him for it. But that had nothing to do with that person's duties at all with regard to what he was supposed to do for Northern Trust. Whereas this case is, because Mr. Collins, his job duties included supervising the lift operator, and we've alleged that, and making sure that it operates in accordance with the ANSI standards. When he said, I'm not going to work with you on that because it's wrong, she basically not only overruled him, but fired him on that point. So the not cooperating and the refusal to cooperate in that activity is what led to his termination. If he had said, all right, fine, you're the boss. I'll do what you want. I'll go tell the operator to just go ahead and load it, and then it's on your conscience if the thing falls down. Well, Rita would have said, that's fine. Then go do that. But she never even gave him the chance. She just said, you're not going to disobey my order. And that's kind of key here because Ms. Fletcher considered his, Mr. Collins' instruction to the operator as a disobedience of her order. And so if you're asking about a refusal, Ms. Fletcher considered it a refusal. The district now takes the position that it wasn't a refusal, but Ms. Fletcher certainly considered it a refusal because she told him that you disobeyed my order. It didn't matter who she gave the order to. She said, Mr. Collins disobeyed my order. So in that sense, you do have a refusal. And I think that you suggested following Sardega, which of course is decided by a different district. If you're inclined to read the refusal a little broader, I think this case would be a good way of doing that because while it's distinguishable, this is part of his duties, and taking somebody out of the loop and then as a prelude to termination is essentially the same thing as the refusal that you were alluding to in Sardega. So I believe the first element is true. But what else did he do? After his conversation with Ms. Fletcher, what did your client do or refuse to do with respect to that ski lift? Did he have a further conversation with the operator? Did he have a conversation with anyone? Or did he just go, that's it? I got my reprimand, and he walked away? I don't have any allegation that he did anything beyond that. I mean, I suppose something could come out of discovery if the case is returned to the trial court. So where's the refusal? The refusal is when he learned, when he learned from the operator that Ms. Fletcher had ordered it to be done that way, Mr. Collins, in his capacity as a supervising agent for making sure the lift operates properly, says, no, that's wrong. You need to operate it the previous way. He knows that there's an order from above that says that. Now, if he doesn't refuse to- But he leaves it with the operator, stop putting four people in, put two every other car. Right. Does he ever take any additional action after that? Well, after Ms. Fletcher told, after Ms. Fletcher yelled at him, there really wasn't much he could do. So he didn't do anything. He was reassigned someplace else and then fired. He was fired before, in fact, they didn't even tell him that the inspector was coming when that's something he would normally do. They kept him out of the loop, and so he had no capacity to do anything further. So he didn't refuse to do anything after that conversation with Ms. Fletcher? Well, he refused to have anything to do with running the lift properly. Well, did he refuse or did they take him out of the loop? Which is it? It was both. He said, I can't go along with that. And they said, fine, you're out of here. And less than about a week, maybe 10 days later, they fired him anyway. So they didn't fire him on the spot. It's pretty convenient that they do that. And now they can come out and say that, well, then after Ms. Fletcher talked to him, he didn't do anything. Well, all they did was delay his firing. They could have and probably would have fired him that very day, but they had to consult with their higher-ups and attorneys first. How did the inspector get there? Was it a regularly scheduled visit or was an inspector summoned to come and look at the activity? That question, I don't know the answer to that question. I think sometimes they do unscheduled visits. They might do scheduled visits at times. Unscheduled visits would be good because then they can see without the other side preparing for it. But Mr. Collins was not aware of his visit, and we've alleged that. If it were a regularly scheduled visit, then he would have been aware of it in his capacity. So I would read that to have been an unscheduled visit. And I note that the lower court believed it was that plaintiff was just objecting to the district's decision. But, in fact, as I explained earlier, he actually tried to reverse that decision, and it was that act that really got him fired. What he did after Ms. Fletcher reprimanded him isn't as relevant because he wasn't fired for doing what he did after or didn't do after Ms. Fletcher reprimanded him. It's for what he did before Ms. Fletcher reprimanded him, which was countermanding her order and making it run the correct way. I can move on to the retaliatory discharge. If you could let us know what the specifically mandated public policy is that we're talking about with that. The specifically mandated public policy is set forth in what is called the Carnival Amusement Rides Safety Act, which includes ski lifts. And what that is, it's a comprehensive scheme to set safety standards for carnival rides. And the statute directs the administrative agency, here the Department of Labor, to use this to promote standards. And they can use standards published by private sources, like the ANSI Code. And the Department of Labor did, in fact, promulgate the ANSI Code as the way that ski lifts are to be both manufactured, maintained, and operated. And these are mandatory things. And the purpose of these mandatory regulations is to make sure that these things are operating safely. That is the policy behind CARSA, which is to make sure that these rides are going safely and they don't fall down and injure lots of people, including kids who are riding it. Essential to CARSA is that everybody who's involved with the ski lift has to cooperate in doing that. And that includes things like keeping records, informing inspectors of any problems that may come up in the records, and personally. And plaintiffs actually did that on previous occasions when inspectors came and said, well, this is what we found, and so this is what we think ought to be done. And the inspector made his own reports. So we have to keep, the defendant has to keep records, the defendant's employees, like the plaintiff, has to keep records, and the inspector has to keep records. And just as important, if they do find a defect that makes it dangerous and in violation of the code to operate, then in that case they have to operate in a different way. And there are specific standards that say that. It can't be operated if it would cause a defect under anticipated conditions of loading. And that's ANSI 4.1, .3, .3, .3, there are a whole bunch of numbers on that. And what our client observed is that under anticipated conditions of loading, namely all four people in every chair, the rope was running outside of those sheet grooves. And he said, that's a problem. And so we have to get that fixed because if it's running outside the sheet grooves, there's a chance it could fall down and crash. We don't want that to happen. And so the defendant comes up with a way to fix it. In the meantime, the plaintiff learned from his own testing that if it's not loaded as heavy as it usually is, then that problem won't happen. And so that's what he directed to be done. Now, the defendant wants to say that, well, it's not really a public policy because there are no legislative findings in something. But there's no case that says that you have to have a separate little throw-clearing findings section in any laws that say, we think it's important to preserve skier safety, and so we're going to do these regulations. There's no case that says you have to have one of those. And even if there were, it's clearly set forth in the statute that the Department of Labor is to set forth safety standards for cargo rides. And then the defendant says, well, it has to provide a private right of action. Well, no case says that either. In fact, the case of Cardi, Cardi v. The Sugar Company, said that to use that analysis is to use the wrong analysis. That was what this court found. And, in fact, it found that both the One Day Residence Seven Act and the Food, Drug, and Cosmetics Safety Act, neither of those say anything about a private right of action. But, nevertheless, found in both statutes a clearly mandated public policy. In fact, we submit that the Cardi case, along with the Wheeler v. Caterpillar Tractor, are really dispositive of this because both Wheeler and Cardi, as well as this case, are comprehensive safety schemes that the employees are expected to comply with. Not just the employer generally, and it's not just a, well, we care about your safety. These are specific regulations. And our client chose to follow those, and the defendant fired him for it. They put him on the spot to say that you have to choose between your job or the kid's safety. And those regulations are what takes this case out of Turner? It is what takes the case out of Turner. Because it makes clear that these are mandatory things, and not just do the best you can. And not just be safe under the reasonableness language of torts. They're specific standards. And for all those reasons, we believe that the judgment should be reversed. Thank you, Counselor. You will have a chance to give a final argument. Mr. Morgan will proceed. This case is about insubordination. Claimant was told by the operator the executive director gave the operator a specific direction to run the chair. Insubordination goes to retaliation, and retaliation is a question of fact. Is it not under Turner? When you have undisputed facts such as these, it can be a question of law. It's alleged in his complaint specifically that he went to the operator. The operator said, the executive director told me to do it this way. And he said, put aside what the executive director told you. You need to follow my directions. At that point in time, he could have called his supervisor, the superintendent, John Carlson, and said, why are we moving in this direction? He could have called the executive director and said, why are we moving in this direction? Instead, what he decided was that he was the ultimate decider for the park district's policies and operations and that he could countermand and override the executive director's direction to another employee. Had he just called them, he would have learned that that day the superintendent, John Carlson, and another mechanic, Jason London, went out and checked the lift, and they determined that it was safe to be operated in that manner. The executive director is the person who is charged with making the final decisions about the park district's operations and policies. Well, it wasn't quite that way, was it? Didn't they attempt to fix it, but the wrong parts came? And this is ski season, and we're not going to let this day go by. So we'll get, you know, I'm assuming the correct parts were ordered, but in the meantime, they're going to run it this way. You are correct. When he identified the issue and said that this tower needs to be maintained, he initially said, well, I think we should just get some liners. Carlson said, let's get a whole new wheel. So they took it seriously, and they ordered a whole new wheel. Before they began operating it at full capacity, they did go out and inspect it again to make sure that it was okay. Two days later, the inspector came out. Less than two weeks later, an inspector came out from the Department of Labor. And what plaintiff wrote in his letter to the Bartlett examiner was the state said the hill was okay, that it was operating safely. There aren't any facts in his complaint that show that someone's safety was at risk. He, when he was testing it, ran the chairlift at full capacity. So he ran it the way that he said that we're not supposed to. If it was that dangerous, why was he doing that? Well, he never got to test it again. He, Mr. Carlson, never got to test it again after Mrs. Fletcher said this is what you're going to do, and apparently he got some sort of different obligations or different responsibilities within the district. That's right. He didn't inspect it, but the Department of Labor inspectors both checked it within two days and then less than two weeks later, and they said it was safe. They are the ones under the CARSA statute. They're specifically tasked with going out and inspecting rides. But until such time as they came, and that was a couple of weeks after he reported it or at least 10 days after he reported it the first time, why weren't they operating it according to what he said should be done until those inspectors came? The day that there was the dustup where he overturned the executive director's decision, that was January 15th. The first inspector was out there on January 17th. Okay, but he first reported this many days before, and it was being complied with, and they did order parts, but the wrong parts came, and so they just decided to go ahead anyway until later. I mean, they put it back in full operation without repairing it, correct? They did go and inspect it. The superintendent, John Carlson, and the mechanic, Jason Lundin, did inspect it before deciding that it could be operated at full capacity, so there was an inspection. Aren't there facts alleged that they went back to loading it quarter full? That is what is alleged. If that's the case, I think it shows that this case is really about insubordination and his refusal to follow directions rather than the park district's desire to run a safe ski lift. Well, again, when we're talking about the employer's motive in firing someone, I find it very hard to find that we can decide that as a matter of law. How do we decide the employer's motive as a matter of law? The facts here are not in dispute. He specifically alleged the facts that show he attempted to override the executive director's direction to another employee. In his own appellate brief, he writes that that move brought about the wrath of his superiors and ultimately led to the termination of his employment. So this is just like Murphy v. Jason. In that case, the court said the retaliation element couldn't be established because the plaintiff had disregarded his supervisor's specific instructions related to OSHA compliance, and they said that's nothing but insubordination. Here, Collins' conduct was nothing but insubordination. And that was decided on the pleadings or on summary judgment? That was decided on summary judgment, I believe. I mean, you've argued that there's no clearly mandated public policy at play here. In light of Wheeler and Cardi and Mighty Racers, why isn't that the case that this pretty sophisticated regulatory scheme doesn't create a clearly mandated public policy? A number of reasons. First, I think we have to start by looking at the Supreme Court's decision in Turner, which came after Wheeler and Cardi and Mighty Racers. There's language at the end of the opinion, which I think is controlling here. I just want to point it out for the court. The Supreme Court said we agree with the appellate court's special concurrence to the extent that the provision of good medical care by hospitals is in the public interest. It does not follow, however, that all health care employees should be immune from the general at-will employment rules simply because they claim to be reporting on issues that they feel are detrimental to health care. In common law retaliatory discharge actions, the requirement of a clearly mandated public policy is essential. In that case, the Supreme Court said general notions about public safety and public health care are not sufficient. All statutes, in some way or another, go to public safety. And if an employee can just say something's unsafe under a statute without getting to the specifics, then that's not going to cut it under Turner. Didn't the court in Turner go on to say that the plaintiff in Turner did not cite any specific standard that was violated? Yes, they did. The plaintiff here cites a specific standard that was allegedly violated. Here, if we look first starting with the CARSA statute, he hasn't identified any section of the CARSA statute that's been violated.